# NET GROUND LEASE

THIS LEASE, made and entered into this _____ day of May, 1999, by and between Commerce Park Associates 9, LLC, a legally existing Rhode Island Limited Liability Company, with offices at 207 Quaker Lane, West Warwick, Kent County, Rhode Island 02893 (hereinafter referred to as "Tenant"), or its nominee, and the Town of Coventry, a legally existing Rhode Island Municipal Corporation, with offices at 1670 Flat River Road, Coventry, Kent County, Rhode Island 02816, acting by and through a duly constituted majority of its elected Town Council (hereinafter referred to as "Landlord").

## CONTENTS


ARTICLE I - DEMISE OF PREMISES .......... 3
Section 1.1 Premises .......... 3
ARTICLE II - CONSTRUCTION OF PREMISES .......... 3
Section 2.1 Tenant's Construction Obligations .......... 3
Section 2.2 Preparation for Construction .......... 3
Section 2.3 Signs .......... 4
ARTICLE III - LEASE TERM .......... 5
Section 3.1 Term .......... 5
Section 3.2 Extension Options .......... 5
ARTICLE IV - RENT .......... 5
Section 4.1 Rent .......... 5
ARTICLE V - TAXES .......... 6
Section 5.1 Real Estate Taxes .......... 6
ARTICLE VI - UTILITIES .......... 6
Section 6.1 Costs .......... 6
ARTICLE VII - USE AND ASSIGNMENT .......... 6
Section 7.1 Use .......... 6
Section 7.2 Assignment and Subletting .......... 6
Section 7.3 Compliance with Laws .......... 6
Section 7.4 Prohibited Uses .......... 6
ARTICLE VIII - MAINTENANCE AND REPAIRS .......... 7
Section 8.1 Tenant's Repairs .......... 7
Section 8.2 Alterations .......... 7
Section 8.3 Fixtures .......... 7
Section 8.4 Liens .......... 8
ARTICLE IX - INSURANCE .......... 8
Section 9.1 Landlord's Insurance .......... 8
Section 9.2 Tenant's Insurance .......... 8
Section 9.3 Insurance Certificates .......... 8
Section 9.4 Mutual Release, Waiver of Subrogation and Mutual Indemnification .......... 9

ARTICLE X - DAMAGE OR DESTRUCTION 9
Section 10.1 Damage and Destruction 9
ARTICLE XI - EMINENT DOMAIN 9
Section 11.1 Condemnation 9
Section 11.2 Termination Right 10
Section 11.3 Restoration 10
Section 11.4 Award 10
Section 11.5 Termination 10
Section 11.6 No Taking by Town 11
ARTICLE XII - DEFAULT 11
Section 12.1 Remedies Upon Tenant's Default 11
Section 12.2 Remedies Upon Landlord's Default 13
ARTICLE XIII - QUIET ENJOYMENT 14
Section 13.1 Covenants and Warranties 14
Section 13.2 Environmental Restrictions 14
Section 13.3 Environmental Indemnification 14
ARTICLE XIV - SUBORDINATION 22
Section 14.1 Subordination and Attornment 22
ARTICLE XV - MISCELLANEOUS 22
Section 15.1 Holding Over 22
Section 15.2 Non-Waiver of Default 23
Section 15.3 Recording 23
Section 15.4 Notice 23
Section 15.5 Successors and Assigns 23
Section 15.6 Time is of the Essence 23
Section 15.7 Partial Invalidity 24
Section 15.8 Headings, Captions and References 24
Section 15.9 Brokerage Commissions 24
Section 15.10 Governing Law 24
Section 15.11 Force Majeure 24
Section 15.12 Submission of Instrument 24
Section 15.13 Tenant's Authority 25
Section 15.14 Relationship of Parties 25
Section 15.15 Notice to Mortgagee 25
Section 15.16 Estoppel Statement 25
Section 15.17 Assignment of Rents 25
Section 15.18 Mechanic's Liens 26
Section 15.19 Independent Covenants 26
Section 15.20 Security 26
Section 15.21 Entire Agreement 26

## ARTICLE I - DEMISE OF PREMISES

1.1 Premises. For and in consideration of the covenants and agreements contained herein and other valuable consideration as described in Section 13.3 below, the receipt and sufficiency of all of which consideration is hereby acknowledged, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, upon the following terms and conditions, that certain parcel of land and those other improvements designated on the site plan (the "Site Plan") as more particularly described on Exhibit "A" attached hereto and by this reference made a part hereof, containing approximately four hundred thirty-five thousand, six hundred (435,600) gross leasable square feet of land, which land is also known and numbered as Assessor's Plat 15, Lot 96 on the Assessor's Maps of the Town of Coventry (sometimes hereinafter referred to as the "Premises").

## ARTICLE II - CONSTRUCTION OF PREMISES

2.1 **Tenant's Construction.**

Tenant shall have the right, at its sole expense (except as otherwise expressly set forth herein), to develop the Premises for any legal use consistent with the development of the Centre of New England Business Park (the "Centre"). If Tenant, in its sole and absolute discretion, chooses to use or develop the Premises for use in conjunction with the Centre, it shall prepare the Premises, inclusive of infrastructure construction, in accordance with this Lease and Tenant's Construction Plans, as hereinafter defined and to the extent applicable, once such plans have been approved in writing by any body or agency having competent regulatory jurisdiction of the Premises ("Appropriate Agencies"), including without limitation the Rhode Island Department of Environmental Management, including all utilities, storm water management system, and roadway access to the Premises, and shall perform all site preparation and development work related thereto. Said site preparation and development work, whether permanent or temporary, shall hereinafter be collectively referred to as the "Construction Work" and shall include, but not be limited to, all work deemed necessary by Tenant to properly develop the Premises for use in conjunction with the development of the Centre. Tenant's Construction Work shall be performed in a good and workmanlike manner.

2.2 **Preparation for Construction.**

(a) Approval of Construction Plans. At such time as Tenant determines is appropriate, in Tenant's sole and absolute discretion, Tenant's architect(s) and/or engineer(s), which architect(s) and/or engineer(s) shall be properly registered and licensed in the State of Rhode Island, shall prepare and submit to the Appropriate Agencies the Construction Plans, prepared in accordance with all applicable laws, codes and regulations. At any time following the approval of the Construction Plans, Tenant may, in its sole and absolute discretion, commence site preparation of the Premises and construction of Tenant's improvements. Such Construction Work shall be at Tenant's sole cost and expense, unless otherwise agreed upon in writing by Landlord and Tenant.

(b) Land Conditions. At such time as Tenant determines is appropriate, Tenant may order a survey at its sole cost and expense, prepared by a surveyor properly registered and licensed in the State of Rhode Island. In addition, Tenant, at its sole cost and expense, shall have the right, whenever it chooses, and from time to time in Tenant's sole and absolute discretion, to enter upon the Premises and make soil tests, borings and other engineering studies to ascertain whether the Premises is suitable for Tenant's contemplated improvements. Upon completion of the tests, the Premises shall be immediately restored to its former condition by Tenant and at Tenant's sole cost and expense, if Landlord so requests. Such tests, borings, studies and survey must reveal land conditions satisfactory to Tenant. If the land conditions are not satisfactory to Tenant for any reason based upon the results of such tests, borings, studies and survey, (i) Tenant shall notify Landlord of its dissatisfaction and the reason therefor; (ii) Tenant shall provide to Landlord, at no cost to Landlord, copies of all such test results; (iii) Tenant hereby agrees not to disclose to any individual, entity or other party the results of such tests; and (iv) this Lease shall be canceled and become null and void, without recourse to either party hereto, unless Tenant elects to accept such condition of the Premises as Landlord is able to convey or transfer without reservation and without reduction in the Rent and/or any other payments required by this Lease.

(c) Title. Tenant may order, at its sole cost and expense, a leasehold title insurance policy in an amount satisfactory to Tenant from Chicago Title Insurance Company or other title insurance provider acceptable to Tenant. Such title policy must reveal insurable and marketable title in Landlord, and shall reflect any access or other easements to or in connection with the Premises, which easements shall be subject to change, modification or elimination by Tenant, at any time, in Tenant's sole and absolute discretion. Nothing herein shall be deemed in any way to restrict the granting or placement of easements in on or through the Premises for the benefit of the Centre. In the event the title insurance commitment or survey reveals defects or conditions that would render title uninsurable, unmarketable, or interfere with Tenant's contemplated use, Tenant shall advise Landlord in writing within sixty (60) days from the date of notification to Tenant of such event by the Title Insurance Company, and Landlord shall proceed diligently at its own expense to correct same within thirty (30) days from such notice. Landlord shall have the right to extend such cure period, for a period not to exceed another thirty (30) days. In the event that Landlord has been unable to cure such defect by the end of the cure period or extended cure period, this Lease shall be canceled and become null and void and without recourse to either party hereto, unless Tenant elects to accept such title or possession as Landlord is able to convey or transfer without reservation and without reduction in the Rent and/or any other payments required by this Lease.

2.3 Signs. Subject to approval by Landlord, which approval shall not be unreasonably withheld, and subject to the issuance of municipal and other necessary permits and approvals, Tenant shall have the right, at Tenant's sole cost and expense, to install sign(s) on the exterior of any building it constructs as well as elsewhere on the

Premises, provided that such sign(s) shall be maintained in good order and repair in compliance with all applicable governmental rules, regulations or ordinances.

## ARTICLE III - LEASE TERM

3.1 Term. The term of this Lease shall commence upon May __, 1999 (the "Commencement Date") and shall terminate on the day prior to the twenty-fifth (25th) anniversary of the Commencement Date unless extended in accordance with the provisions of Section 3.2 hereof.

3.2 Extension Options. So long as Tenant is not in default (as hereinafter defined), Tenant shall have ten (10) successive options to extend the term of this Lease, each of twenty-five (25) years' duration, exercisable by the delivery of written notice to Landlord by Tenant not less than one hundred eighty (180) days prior to the expiration of the then current initial or extension term, as the case may be; provided, however, that, if Tenant shall fail to give any such notice within the aforesaid time limit, Tenant's right to exercise its option shall nevertheless continue until thirty (30) days after Landlord shall have given Tenant notice of Landlord's election to terminate such option, and Tenant may exercise such option at any time until the expiration of said thirty (30) day period. It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the term of this Lease under any of the options set forth in this Section 3.2 through inadvertent failure to give notice of exercise thereof within the time limits prescribed. Accordingly, if Tenant shall fail to give notice to Landlord of Tenant's election to extend the term of this Lease for any of the aforesaid renewal periods and if Landlord shall fail to give notice to Tenant of Landlord's election to terminate Tenant's right to extend this Lease under the option applicable thereto, then and so often as such event shall occur, the term of this Lease shall be automatically extended from month to month upon all of the terms and conditions then in effect, subject to Tenant's right under such option to extend the term of this Lease for the remainder of the renewal period covered thereby and to Landlord's right to place the thirty (30) day limit on such option by a notice in the manner provided in this Section 3.2. If the option(s) are duly exercised, the term of this Lease shall be automatically extended for the period of the next ensuing option, upon all of the same terms, conditions and covenants as set forth herein, without the requirement of any further instrument to evidence such extension. In the event that Tenant exercises all the options to renew this lease, at the conclusion of the last option term, Tenant shall have the option to purchase the Premises for the payment of one ($1.00) dollar.

## ARTICLE IV - RENT

4.1 Rent. Tenant covenants and agrees to pay to Landlord at the above referenced address, or such other place as Landlord shall designate in writing, the Annual Rent ("Rent") in the sum of one ($1.00) dollar, payable on the annual anniversary of the Commencement Date.

## ARTICLE V - TAXES

5.1 Real Estate Taxes. During the Term, and any extended or option term of this Lease, Tenant shall pay no real estate taxes, betterment assessments or other costs, charges or expenses of any kind levied by Landlord in connection with Tenant's possession, occupancy or use of the Premises.

## ARTICLE VI - UTILITIES

6.1 Costs. Tenant shall install at its expense all utilities it deems necessary for its use or operation of the Premises along with all utility meters necessary for measuring the consumption of utilities serving the Premises and Tenant shall pay directly to the applicable utility companies or authorities, as and when due, all charges for all such utilities consumed on the Premises or within the parcel, whether inside or outside of any building constructed thereon or appurtenant thereto. Tenant shall also pay all utility "tap-in" or connection fees, and any assessment, betterment and/or maintenance fees charged by any municipal, federal or state, or public or private agency, authority, commission, board, or other regulatory or supervisory body, or owner lessor or operator of any utility having authority to so charge for connection to any and all utilities, with the exception of Landlord, to which Tenant shall not be required to make any such payment at any time.

## ARTICLE VII - USE AND ASSIGNMENT

7.1 Use. Tenant shall use the Premises for any legal or authorized use consistent with development of the Centre.

7.2 Assignment and Subletting. So long as Tenant is not in default hereunder, Tenant shall have the right to assign this Lease, or to sublet all or any portion of the Premises.

7.3 Compliance with Laws. Tenant, and any subtenant or assignee thereof, shall use and occupy the Premises so as to comply with all applicable laws and regulations of governmental bodies having jurisdiction. Landlord represents to Tenant that the Premises allows the use intended by Tenant in this Lease.

7.4 Prohibited Uses. Notwithstanding anything to the contrary contained herein, and notwithstanding any provision of common law, federal or state statute, ordinance of the Town of Coventry, or other rule, regulation, or legal provision, the Premises shall not at any time be used, by either Landlord or Tenant, for the storage, disposal, placement, transfer or transportation of any hazardous substance, or any waste material, debris, trash, compost, leaves, yard waste, or other debris, trash or refuse of any kind, other than waste commonly and ordinarily associated with the use of the Premises for athletic events. This provision shall survive the termination of Tenant's occupancy of the Premises and/or the termination of this Lease, regardless of whether any such termination is by default of Tenant, by expiration of term, by operation of law, by

judgment of a court of competent jurisdiction, by legal condemnation or taking by eminent domain, or by any other means, whether legal or equitable.

## ARTICLE VIII - MAINTENANCE AND REPAIRS

8.1 Tenant Repairs. Tenant shall be solely responsible, at Tenant's sole expense, for the proper maintenance, operation and repair of the Premises, including providing all landscaping services, including without limitation grass-cutting, pruning, fertilizing, top dressing, irrigation, replanting and replacement of trees, shrubs, sod and the like, all as deemed necessary in the sole and absolute discretion of Tenant; as well as lighting, removal of snow and ice (if possibly removable after good faith efforts), sanding, salting and all other roadway, parking area, and other pavement treatments all as deemed necessary in the sole and absolute discretion of Tenant; removal of trash, rubbish and other refuse from the Premises; and to maintain in thorough repair and good, safe and substantial order and condition all buildings and improvements erected on the Premises in a reasonably diligent manner to maintain a first class, high quality facility or forming a part thereof (including all building equipment which is an integral part of the building structure), structural and non-structural, extraordinary and ordinary, and Tenant shall likewise at all times and at its own cost and expense, put, keep, replace and maintain all personal property and equipment attached to or used in connection with the Premises in good and safe operating condition. The parties agree that under no circumstances shall Landlord have any repair obligations whatsoever, whether physical or monetary or of any other nature, type or description, for any portion of the Premises, except as provided in Article XIII of this Lease.

8.2 Alterations. Tenant may, at Tenant's sole cost and expense, alter, demolish and remove any existing improvements or betterments on the Premises and any improvements or betterments hereafter erected from time to time on the Premises, provided that (a) said work is performed in a good and workmanlike manner; and (b) Tenant has first obtained the prior written consent of any Appropriate Agency which consent is deemed necessary by Tenant for such action. In the event such consent is granted, and if necessary, Landlord shall execute all instruments necessary to obtain licenses and permits to make such alterations from the applicable governmental authorities. It is agreed by and between the parties that any building and other improvements on the Premises ("betterments and improvements") shall at all times be and remain the sole and exclusive property of Tenant unless and until the lease terminates or Tenant abandons the Premises.

8.3 Fixtures. Any fixtures and/or equipment that Tenant installs on the Premises at its expense prior to or during the term hereof shall remain Tenant's property and may be removed by Tenant provided that Tenant repairs any damage to the Premises caused by such removal at its sole cost and expense.

8.4 Liens. Tenant shall promptly pay when due the entire cost of all work done by it to the Premises and shall keep the Premises free of liens for labor or materials. Should mechanics', materialmen's or other liens be filed against the Premises by reason of any acts of Tenant, Tenant shall cause the lien to be canceled and discharged of record within a reasonable time of receiving actual notice thereof.

## ARTICLE IX - INSURANCE

9.1 Landlord's Insurance. Landlord shall at all times maintain comprehensive general liability insurance covering the Premises, against claims for personal injury and damage to property naming Tenant as an additional insured under a policy, with minimum limits as determined by Landlord's insurer and/or Mortgagee, if any, as well as whatever insurance is deemed required in the judgement of Tenant's insurers and or Tenant's mortgagees of Tenant's adjacent property in the Centre for the perils and potential liability described in Article XIII of this Lease, naming Tenant as an additional insured. Subject to the consent of Tenant, which consent may not be unreasonably withheld, Landlord may self-insure part or all of any of the aforesaid insurance coverages. In the event that Landlord is allowed by Tenant to self-insure all or any part of any risk that would be insured under the policies and limits described above, and an event occurs where insurance proceeds would otherwise have been available, Landlord shall make funds available to the same extent that they would have been available had such insurance policy been carried.

9.2 Tenant's Insurance. Tenant shall maintain public liability and property damage insurance covering the Premises with minimum limits of Three Million and No/100 Dollars ($3,000,000.00) for personal injury or death per person, Five Million and No/100 Dollars ($5,000,000.00) per occurrence and not less than a reasonable amount for property damage, or such other amounts or limits as may be determined from time to time by Tenant's Lenders. Tenant shall keep in force workers' compensation or similar insurance to the extent required by law. Tenant shall maintain and carry fire and extended coverage insurance on any building, betterments and improvements, naming Landlord as an additional insured. Subject to the consent of Landlord, which consent may not be unreasonably withheld, Tenant may self-insure part or all of any of the aforesaid insurance coverages. In the event that Tenant is allowed by Landlord to self-insure all or any part of any risk that would be insured under the policies and limits described above, and an event occurs where insurance proceeds would otherwise have been available, Tenant shall make funds available to the same extent that they would have been available had such insurance policy been carried.

9.3 Insurance Certificates. All of the foregoing insurance policies required pursuant to Sections 9.1 and 9.2 above shall be written with companies licensed to do business in the State of Rhode Island with a Best's rating of A+ or higher and shall provide that the other party hereto shall be given a minimum of ten (10) days' written

notice by any such insurance company prior to the cancellation, termination or alteration of the terms or limits of such coverage. Each party shall deliver to the other party hereto the foregoing insurance policies or certificates thereof prior to the tender of possession of the Premises to Tenant and evidence of all renewals or replacements of same not less than ten (10) days prior to the expiration date of such policies. All such policies may be maintained under a "blanket insurance policy" of Landlord or Tenant.

9.4 Mutual Release, Waiver of Subrogation and Mutual Indemnification. Subject to and except with respect to matters arising under the provisions of Article XIII of this Lease, Landlord and Tenant hereby release each other and anyone claiming through or under the other by way of subrogation or otherwise from any and all liability for any loss of or damage to property, whether caused by the negligence or fault of the other party, to the extent of any recovery made by the parties hereto for such loss or damage under any fire and standard extended coverage insurance policy now or hereafter issued covering the Premises. In addition, Landlord and Tenant shall, to the extent possible, cause each such insurance policy carried by them insuring the Premises, the Building and/or the Centre or the contents thereof, to be written to provide that the insurer waives all rights of recovery by way of subrogation against the other party hereto in connection with any loss or damage covered by the policy, it being the intention of the parties that each shall not be responsible for the negligent or other acts of the other party and that the neither the parties nor their insurance carriers have any claims against each other with respect thereto. Provided that, subject to and except with respect to matters arising under the provisions of Article XIII of this Lease, Landlord and Tenant agree to indemnify and hold each other harmless from and against any and all claims, damages or causes of action for damages brought on account of injury to any person or persons or property, or loss of life, arising out of the use, operation or maintenance of the Premises, unless same is due to the willful misconduct, and limited to the extent not due to the negligence, of the other party.

## ARTICLE X - DAMAGE OR DESTRUCTION

10.1 Damage and Destruction.

In the event of damage or destruction to the Premises during the term or any extension thereof by fire or other casualty, Tenant shall have the right, in its sole and absolute discretion, to terminate this Lease. Tenant shall also have the right, in its sole and absolute discretion and at its expense, to repair the Premises to the same condition existing immediately prior to such casualty or such other condition as is satisfactory to Tenant.

## ARTICLE XI - EMINENT DOMAIN

11.1 Condemnation. If after the execution of this Lease and prior to the expiration of the term hereof, the whole of the Premises shall be taken under power of

eminent domain by any public or private authority other than the Town of Coventry, or conveyed by Landlord to any such public or private authority in lieu of such taking, then this Lease and the term hereof shall cease and terminate as of the date of such taking, subject, however, to the right of Tenant, at its election, to continue to occupy the Premises, subject to the terms and provisions of this Lease, for all or such part, as Tenant may determine, of the period between the date of such taking and the date when possession of the Premises shall be taken by the taking authority and any unearned rent or other charges, if any, paid in advance, shall be refunded to Tenant on a pro rata basis.

11.2 Termination Right. If, after the execution of this Lease and prior to the expiration of the term hereof, any taking under the power of eminent domain by any such public or private authority except the Town of Coventry, or any conveyance by Landlord in lieu thereof, shall result in (a) a reduction of forty (40%) percent or more of the gross useable, buildable or leasable area of the Premises; or (b) the reduction of the legal minimum parking area for the Premises as required by applicable zoning ordinances and regulations; or (c) a taking that results in the closing of all access to the Premises; then either party may, at its election, terminate this Lease by giving the other party notice of the exercise of such election within thirty (30) days after the receipt of notice of such taking. In the event of termination under the provisions of this Section, this Lease and the term hereof shall cease and terminate, and all obligations of each party to the other shall cease in the same manner as if the date of such taking were the acknowledged termination of this Lease, and any unearned rent or other charges, if any, paid in advance by Tenant shall be refunded to Tenant on a pro rata basis. In the sole and absolute discretion of Landlord, Tenant may continue to occupy the Premises, subject to the terms and provisions of this Lease, for all or such part of the period from the date of the taking until the date when possession of the Premises shall actually be taken by the appropriating authority.

11.3 Restoration. In the event of a taking in respect of which Tenant shall not have the right to elect to terminate this Lease or, having such right, shall not elect to terminate this Lease, this Lease and the term thereof shall continue in full force and effect.

11.4 Award. All compensation awarded for any taking, whether for the whole or a portion of the Premises, shall belong to Landlord and Tenant insofar as and to the extent that each of their ownership interests may appear. Tenant may apply for and receive an award for the loss of Tenant's leasehold estate so long as such award in no way diminishes any award to Landlord or to any mortgagee of Landlord with respect to Landlord's remainder.

11.5 Termination. In the event of any termination of this Lease as the result of the provisions of this ARTICLE XI, the parties, effective as of such termination, shall be released, each to the other, from all liability and obligations thereafter arising under

this Lease, subject to and except for matters arising under the provisions of Article XIII of this Lease.

11.6 <u>No Taking By Town</u>. The Town of Coventry, as Landlord under this Lease, hereby covenants and agrees with Tenant that it will not take or condemn or attempt to take or condemn by eminent domain or any other means the Premises that are the subject of this Lease.

## ARTICLE XII - DEFAULT

12.1 <u>Remedies Upon Tenant's Default</u>. In the event Tenant shall at any time be in default in the payment of rent or other charges herein required to be paid by Tenant or in the observance or performance of any of the other covenants, agreements, terms, provisions, obligations or requirements of this Lease and/or any rule or regulation issued pursuant hereto or in conjunction herewith, regardless of whether such term, provision, covenant, agreement, rule or regulation states that failure to comply therewith shall be deemed an event of default, and any such default shall continue for a period of ten (10) days after written notice to Tenant [or if such default is incapable of being cured in a reasonable manner within ten (10) days, then if Tenant has not commenced to cure the same within said ten (10) day period and thereafter diligently prosecuted the same to completion] and Tenant shall not thereafter cure such default; or should Tenant at any time use the Premises or any portion thereof for any illegal or unlawful purpose, or commit, or permit or tolerate the commission therein of any illegal or unlawful act or utilize the Premises or place in any building any objects which would give any fire or casualty insurer the right to cancel such coverage or otherwise endanger the safety of the property and persons thereon, and should such actions continue for a period of five (5) days after written notice has been given to Tenant; or if at any time during the tenancy there shall be filed by or against Tenant or any successor tenant then in possession in any court pursuant to any statute either of the United States or of any state, a petition (i) in bankruptcy, (ii) alleging insolvency, (ii) for reorganization, (iv) for the appointment of a receiver, or (v) an arrangement under the Bankruptcy Acts, or if a similar type of proceeding shall be filed and Tenant is unsuccessful in causing any proceeding described aforesaid to be dismissed with prejudice within thirty (30) days after its filing; or if Tenant makes any assignment for the benefit of creditors; then in any such case, Landlord may thereafter terminate this Lease by notice to Tenant, specifying a date not less than five (5) days after the giving of such notice on which this Lease shall terminate and this Lease shall come to an end on the date specified therein as fully and completely as if such date was the date herein originally fixed for the termination hereof, and Tenant shall then peacefully quit and surrender the Premises to Landlord and shall have ten (10) days to remove its property from the Premises prior to the applicability of any hold-over provision but Tenant shall remain liable as hereafter provided. All reasonable costs and expenses incurred by or on behalf of Landlord

occasioned by such event of default, including without limitation, actual attorney's fees and other costs of collection, recovery of possession and the exercise of any right or remedy permitted Landlord hereunder shall be paid by Tenant, and Landlord shall have a lien on all of Tenant's property to secure payment of same. Upon any such termination of this Lease, Tenant shall quietly and peacefully surrender the Premises to Landlord, and Landlord, upon or at any time after ten (10) days after any such termination, may enter upon and re-enter the Premises and possess and repossess itself thereof, with or without commencement and prosecution of legal action such as summary proceedings, ejectment or otherwise, and may dispossess Tenant and remove Tenant and all other persons and property from the Premises and may have, hold and enjoy the Premises and the right to receive all rental income of and from the same, which amounts received by Landlord shall be credited against any amounts due from Tenant pursuant to this Section. At any time or from time to time after any such termination, Landlord may relet the Premises or any part thereof, in the name of Landlord or otherwise, for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the Term of this Lease) and on such conditions as Landlord, in its sole and absolute discretion, may determine and may collect and receive the rents therefor. Landlord shall use commercially reasonable efforts to mitigate its damages and relet the Premises. Landlord shall receive the rent therefrom, applying the same first to the payment of the reasonable expenses of such re-entry and the reasonable cost of such reletting, and then to the payment of the rental accruing hereunder, the balance, if any, to be credited against future rents owed by Tenant solely for the period of each such reletting. No such termination of this Lease upon a default by Tenant shall relieve Tenant of its liability and obligations under this Lease, and such liability and obligations shall survive the termination. In the event of any such expiration or termination upon a default by Tenant, whether or not the Premises or any part thereof shall have been relet, Tenant shall pay to Landlord the Rent and all other sums, amounts and charges required to be paid by Tenant up to the time of such expiration or termination of this Lease, and thereafter Tenant, until the end of what would have been the term of this Lease in the absence of such expiration or termination shall be liable to Landlord for, and shall pay to Landlord Rent and the other sums, amounts and charges as same become due, less the net proceeds of any reletting effected pursuant to the provisions of Section 12.1 hereof, after deducting all Landlord's actual expenses in connection with such reletting, including without limitation, all repossession and removal costs, brokerage commissions, legal expenses, attorneys' fees, alteration costs and expenses of preparation of the Premises for such reletting as all of same may be reasonable. Tenant shall pay such damages (herein called "deficiency") to Landlord monthly on the first day of the month, and Landlord shall be entitled to recover from Tenant each monthly deficiency as the same shall arise. For purposes of this Section 12.1, Additional Rent shall include reasonable utilities consumed in the

Premises to maintain the same while vacant. Other than as set forth in this Lease, Tenant hereby expressly waives any and all right of redemption or re-entry or repossession or to restore the operation of this Lease in case Tenant shall be dispossessed by a judgement or by warrant of any court or judge. Tenant waives and will waive trial by jury in any action, proceeding or counterclaim brought by Landlord for the collection of rents, or any other sums due or which may become due pursuant to the provisions or operation of this Lease. In the event of any breach by Tenant of any of the covenants, agreements, terms or conditions contained in this Lease, Landlord shall be entitled to enjoin such breach and shall have the right to invoke any right and remedy allowed at law or in equity or by statute as though re-entry, summary proceedings, and other remedies were not provided for in this Lease. Notwithstanding any foregoing provision to the contrary, in the event of emergencies, or where necessary to prevent injury to persons or damage to property, Landlord may cure a default by Tenant before the expiration of any waiting period and without notice. Each right and remedy of Landlord provided for in this Lease or otherwise existing at law or in equity shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute and the exercise or beginning of the exercise by Landlord of any one or more of the rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute shall not preclude or waive the simultaneous, earlier, later or other exercise by Landlord of any or all other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute.

12.2 Remedies Upon Landlord's Default. In the event that Landlord shall at any time be in default in the observance of performance of any of the covenants and agreements required to be performed and observed by Landlord hereunder and any such default shall continue for a period of thirty (30) days after written notice to Landlord [or if such default is incapable of being cured in a reasonable manner within thirty (30) days then if Landlord has not commenced to cure the same within said thirty (30) day period and thereafter diligently prosecutes the same to completion] and Landlord shall not thereafter cure such default, Tenant may, at its option, terminate this Lease upon ninety (90) days' written notice to Landlord or Tenant may cause the default to be cured and offset the reasonable cost thereof against amounts due or which may become due to Landlord under this Lease, exclusive of Rent. In the event Tenant shall elect to terminate this Lease, as aforesaid, all rights and obligations of Tenant, and of any permitted successors or assigns, except for the obligation to pay any due but as yet unpaid Rent, shall cease and terminate. In the event that Landlord commences any suit for the collection of any amounts for which Tenant may be in default or for the performance of any other covenant or agreement hereunder, the non-prevailing party shall pay all reasonable attorneys' fees and other expenses incurred by the prevailing party enforcing such obligations and/or collecting such amounts, plus interest thereon

at the highest legal rate not to exceed eighteen (18%) percent per annum. All remedies of Tenant and Landlord herein created or remedies otherwise existing at law or equity are cumulative and the exercise of one or more rights or remedies shall not be taken to preclude or waive the right to the exercise of any other.

## ARTICLE XIII - QUIET ENJOYMENT

13.1 Covenants and Warranties. Landlord covenants and warrants that Landlord is the true and lawful owner of the Premises and has good right and full power to let and lease the same.

13.2 Environmental Restrictions. The Premises shall not be used for the manufacture, storage or disposal of explosive or radioactive materials or of any hazardous, toxic, petroleum or other substance which may have a deleterious effect upon the environment or subject Landlord to any liability.

13.3 Environmental Indemnification. As a result of Tenant's entering into this Lease and acceptance of the Premises, the potential may exist for Tenant to incur or suffer certain liabilities, costs and/or expenses relating to Hazardous Materials (as hereinafter defined). Tenant has therefore required the inclusion of this Article of this Lease as a condition precedent to Tenant's execution hereof in order to protect Tenant from any such liabilities, costs and/or expenses, and Tenant would not be willing to enter into this Lease in the absence of the inclusion herein of this Article. Landlord, in consideration of the foregoing and as an inducement to Tenant to enter into this Lease and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby covenants and agrees to and for the benefit of Tenant as follows: Each reference in this Article to the following terms should be deemed to have the following meanings: (A) Environmental Enforcement Action: all actions, orders, requirements or liens instituted, threatened, required, completed, imposed or placed by any Governmental Authority and all claims made or threatened by any other person against or with respect to the Premises, or any present or past owner or occupant thereof, arising out of or in connection with any of the Environmental Legal Requirements, any environmental condition, or the assessment, monitoring, clean-up, containment, remediation or removal of, or damages caused or alleged to be caused by, any Hazardous Materials (1) located on or under the Premises or any surrounding property, (2) emanating from the Property or any surrounding property, or (3) generated, stored, transported, utilized, disposed, managed, or released by any Indemnitor (whether or not on, under or from the Property or any surrounding property); (B) Environmental Legal Requirements: all applicable past (which have current effect), present or future federal, state, county and local laws, by-laws, rules, regulations, codes and ordinances, or any judicial or administrative interpretations thereof, and the requirements of any Governmental Authority, pertaining to the regulation or protection of the environment, or the health and safety of persons and property, or relating in any way to Hazardous

Materials (or the existence, release, use, discharge, disclosure or disposal thereof); (C) Environmental Site Report: any report(s) provided to Tenant in connection with its environmental investigation of the Premises, including without limitation any documents maintained by the Coventry Department of Public Works which documents concern, refer to, or in any way contain information relative to the status of the Premises as a so-called "dump site" or "landfill", or as a disposal area for waste, whether deemed hazardous or not, or as the former site of the Town's yard waste or so-called "compost facility", all of which documents are included as an Appendix to this Lease and referred to as "Exhibit B"; (D) Governmental Authority: each and every national, state and local governmental or quasi-governmental body, department, agency or entity which has, or claims to have, jurisdiction over Indemnitor or the Premises or any other property adjacent to or affecting the Premises; (E) Hazardous Materials: means and includes, but is not limited to, any petroleum product and all hazardous or toxic wastes or substances, any substance which because of their quantitative concentration, chemical, radioactive, flammable, explosive, infectious or other characteristics, constitute or may reasonably be expected to constitute or contribute to a danger or hazard to public health, safety or welfare or to the environment, including, without limitation, any asbestos (whether or not friable) and any asbestos-containing materials, waste oils, solvents and chlorinated oils, polychlorinated biphenyls (PCB's), other carcinogens, toxic metals, etchants, pickling and plating wastes, explosives, reactive metals and compounds, pesticides, herbicides, radon gas, urea formaldehyde foam insulation and chemical, biological and radioactive wastes, or any other similar materials or any "hazardous" or "toxic" wastes or substances which are included under or regulated by any Environmental Legal Requirements; (F) Indemnitor: the Town of Coventry, a legally existing Rhode Island Municipal Corporation, acting by and through a duly constituted and majority of its elected Town Council, also sometimes described herein as "Landlord", which term is used interchangeably with and has the same meaning herein as the term "Indemnitor"; (G) Indemnified Party: (1) Tenant; (2) all those claiming by, through or under Tenant, including any subsequent assignee or subtenant; and (3) as to each of the foregoing, their respective affiliate, parent and subsidiary corporations, and, as applicable, the respective officers, directors, stockholders, agents, employees, accountants and attorneys of any one or more of them, and any person firm or entity which controls, is controlled by, controlling, or under common control with, any one or more of them, also sometimes described herein as "Tenant", which term is used interchangeably with and has the same meaning herein as the term "Indemnified Party"; (H) Lease: that certain Lease entered into between Landlord and Tenant of which this Article is a part and for which the provisions of this Article are consideration; (I) Permits: any action, however denominated and in whatever form, including without limitation, permit, license, approval, consent, waiver, exemption, variance, franchise, order, right or authorization of or from any Governmental Authority; (J) Premises: the land more particularly

described on Exhibit A attached hereto, as well as any improvements, now or hereafter thereon located; and shall also include any other tangible property which Tenant now or hereafter places, installs or use on the Premsies in the ordinary course of the use to which the Premsies is put; (K) State: the State of Rhode Island. The terms "generated," "stored," "transported," "utilized", "disposed," "managed," "released" and "threat of release," and all conjugates thereof, shall have the meanings and definitions set forth in the Environmental Legal Requirements. All other capitalized terms used in this Article which are not otherwise specifically defined herein shall have the same meaning herein as in the other Articles of this Lease. At all times, both during and after the tenancy provided for in this Lease, Indemnitor hereby agrees that it shall at its sole cost and expense indemnify, defend, exonerate, protect and save harmless each Indemnified Party against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or nature whatsoever, including, without limitation, attorneys' and experts' fees and disbursements, which may at any time be imposed upon, incurred by or asserted or awarded against Tenant or any other indemnified party and arising from or out of: (A) any Hazardous Materials on, in, under or affecting, all or any portion of the Premises on or before the date hereof, or which may hereafter affect all or any portion of the Premises, whenever discovered and however caused; (B) the violation of any Environmental Legal Requirements by Landlord or any third party, or with respect to the Premises, existing on or before the date hereof or which may so exist in the future, whenever discovered and however caused; (C) any breach of any representation or warranty made under or pursuant to this Article; and (D) the enforcement of the terms of this Article or the assertion by Indemnitor of any defense to the obligations of Indemnitor hereunder, whether any of such matters arise before or after foreclosure of any mortgage or other taking of title to or possession of all or any portion of the Property by any person, firm, entity or agency so authorized to do or other exercise of remedies under this Lease, and specifically including therein, without limitation, the following: (1) costs incurred for any of the matters set forth in this Article; and (2) costs and expenses incurred in ascertaining the existence or extent of any asserted violation of any Environmental Legal Requirements relating to the Premises and any remedial action taken on account thereof. Indemnitor represents and warrants to Tenant, the same to be true as of the date hereof and throughout the period that this Lease shall remain in force and effect, and for as long thereafter as Tenant may be potentially liable therefor, that except as otherwise expressly disclosed in the Environmental Site Report: (A) no Hazardous Materials have been or are currently generated, stored, transported, utilized, disposed of, managed, released or located on, under or from the Premises, whether or not in reportable quantities, or in any manner introduced onto the Premises including without limitation any septic, sewage or other waste disposal systems servicing the Premises; (B) Indemnitor has received no notice from any Governmental Authority

or any other party claiming that (1) the Premises or any use thereof violates or may violate any Environmental Legal Requirements, or (2) neither Indemnitor nor any of its employees or agents has violated or may have violated any Environmental Legal Requirements; (C) Indemnitor has incurred no liability to any Governmental Authority or any other party under any Environmental Legal Requirements; (D) no lien against the Premises has arisen under or related to any Environmental Legal Requirements; (E) there are no Environmental Enforcement Actions pending, or to the best of Indemnitor's knowledge and belief after due inquiry, threatened; (F) Indemnitor has no knowledge of any action or order instituted or threatened by any person or Governmental Authority arising out of or in connection with any Environmental Legal Requirements involving the assessment, monitoring, cleanup, containment, remediation or removal of or damages caused or alleged to be caused by any Hazardous Materials generated, stored, transported, utilized, disposed of, managed, released or located on, under or from any Premises which is adjacent to the Premises; (G) there are no underground storage tanks on or under the Premises; (H) Indemnitor is a duly organized validly existing entity in good standing under the laws of the State of Rhode Island, is duly qualified to transact business in all other states required by the nature of its activities, if any, and has all requisite power and authority to execute this Lease specifically including the terms and conditions contained in this Article and to conduct its business and to own its properties as now conducted or owned; (I) this Lease, specifically including the provisions of this Article, constitutes the legal valid and binding obligation of Indemnitor and is enforceable against it in accordance with its terms; (J) the execution of this Lease and the performance by Indemnitor of its obligations hereunder will not constitute a violation of any law, order, regulation, contract or agreement to which Indemnitor is a party or by which Indemnitor or its Premises is or may be bound; (K) there is no material litigation or administrative proceeding now pending or threatened against Indemnitor which, if adversely determined, could materially impair its ability to pay or perform its obligations hereunder; and (L) Indemnitor has no knowledge of any of the foregoing conditions, defects, liens, notices or other matters described above as to any adjacent Premises or other Premises which might, by virtue of movement of Hazardous Materials or otherwise, have a material adverse effect on the Premises. Indemnitor shall comply with all Environmental Legal Requirements applicable to Indemnitor or Premises including without limitation, obtaining and maintaining in full force and effect, all Permits required thereunder. Without limiting the generality of the foregoing, Indemnitor agrees that it shall not: (A) release or permit any release or threat of release of any Hazardous Materials on the Premises; (B) generate or permit any Hazardous Materials to be generated on the Premises; (C) except in strict compliance with all Environmental Legal Requirements, store, or utilize, or permit any Hazardous Materials to be stored or utilized on the Premises; (D) dispose of or permit any Hazardous Materials to be disposed of on the Premises; or (E) fail to maintain and use the Premises,

and/or permit the Premises not to be maintained and used, in accordance with all Environmental Legal Requirements. Indemnitor shall provide Tenant, and Tenant shall likewise provide Indemnitor, with prompt written notice, but in no event later than ten (10) days after obtaining actual knowledge thereof, of any of the following conditions: (A) the presence, or any release or threat of release, of any Hazardous Materials on, under or from the Premises, or any surrounding Premises, whether or not caused by Indemnitor; (B) any Environmental Enforcement Action instituted or threatened; or (C) any condition or occurrence on the Premises or any surrounding Premises that may constitute a violation of any of the Environmental Legal Requirements. Upon Indemnitor's becoming aware of the violation of any Environmental Legal Requirement related to the Premises, or the presence, or any release or any threat of release, of any Hazardous Materials on, under, or from the Premises, whether or not caused by Indemnitor, Indemnitor shall, subject to the right to contest set forth below, immediately take all actions to cure or eliminate any such violation of any such Environmental Legal Requirement and to contain and remove any such Hazardous Materials in full compliance with and as required by any Environmental Enforcement Action or applicable Environmental Legal Requirements. Indemnitor may contest in good faith any claim, demand, levy or assessment under any Environmental Legal Requirements if (A) the contest is at all times based upon a material question of law or fact raised by Indemnitor in good faith; (B) Indemnitor properly commences and thereafter diligently pursues the contest by appropriate proceedings; (C) the contest will not materially impair the taking of any required remedial action with respect to such claim, demand, levy or assessment or operate to create a material risk of worsening environmental conditions affecting the Premises; (D) Indemnitor demonstrates to Tenant's satisfaction that Indemnitor has the financial capability to undertake and pay for such contest and any remedial action then or thereafter necessary, which demonstration may include, if required by Tenant, the posting of a bond, letter of credit or cash reserves or collateral sufficient to pay all costs of such contest and any such remedial action. So long as the Lease shall remain in effect or for as long thereafter as Tenant may have any potential liability, Tenant shall have the right, but not the obligation, through such representatives or independent contractors as it may designate, (A) cure any breach of the representations, warranties, covenants and conditions made by or imposed upon Indemnitor under this Article including without limitation any violation by Indemnitor, or by the Premises, or by any prior occupant or prior owner thereof, of any of the Environmental Legal Requirements; (B) take all actions as are necessary to (1) prevent the migration of Hazardous Materials on, under, or from the Premises to any other Premises; (2) clean-up, contain, remediate or remove any Hazardous Materials on, under, or from any other Premises which Hazardous Materials originated on, under, or from the Premises; or (3) prevent the migration of any Hazardous Materials on, under, or from any other Premises to the Premises; (C) comply

with, settle, or otherwise satisfy any Environmental Enforcement Action including, but not limited to, the payment of any funds or penalties imposed by any Governmental Authority and the payment of all amounts required to remove any lien or threat of lien on or affecting the Premises; and (D) comply with, settle, or otherwise satisfy any Environmental Legal Requirement and correct or abate any environmental condition on, or which threatens, the Premises and which could cause damage or injury to the Premises or any surrounding Premises or to any person. Any amounts paid or advanced by Tenant and all costs and expenditures incurred in connection with any action taken pursuant to the terms of this Article, including but not limited to environmental consultants, and experts, fees and expenses, attorneys, fees and expenses, court costs and all costs of assessment, monitoring, clean-up, containment, remediation, removal and restoration, with interest thereon at the rate of ten (10%) percent per year, shall be a demand obligation of Indemnitor to Tenant and, to the extent paid by Tenant shall be secured by a lien on all other property of Indemnitor as fully and as effectively and with the same priority as every other obligation secured thereby. So long as this Lease shall remain in force and effect, or for as long thereafter as Tenant may have any potential liability, Tenant shall have the right, but not the obligation, through such representatives or independent contractors as it may designate, to obtain one or more professional environmental site assessments of the Premises. Any such environmental site assessment shall be in all respects satisfactory to Tenant, in its sole discretion, in order for Tenant to obtain a complete assessment of the compliance of the Premises and the use thereof with all Environmental Legal Requirements. If Tenant causes any such environmental site assessment to be undertaken because Tenant has reason to suspect the existence of any of the conditions specified in this Article, or if Tenant causes the same to be undertaken without such reason but such environmental site assessment discloses that any such conditions are so present, or if Tenant causes such environmental site assessment to be undertaken after an Event of Default by Landlord and in contemplation of exercise of its remedies under the Lease or applicable law, Indemnitor shall pay the cost thereof to Tenant on demand, with interest thereon at the rate of ten (10%) percent per year and the amount thereof shall become a lien against all other property of Landlord. Tenant does not contemplate the exercise of any rights which might be deemed to place upon Tenant any liability hereunder except in connection with reducing the potential risk to Tenant in connection therewith. As a result, neither the right on Tenant's part to exercise, nor the exercise by Tenant of any one or more of the rights and remedies set forth in this Lease shall operate or be deemed (A) to place upon Tenant any liability for environmental responsibility or (B) make Tenant the "owner" of the Premises or a "responsible party" within the meaning of any of the Environmental Legal Requirements. Without limiting the generality of the other provisions of this Lease, any partial exercise by Tenant of any one or more of the rights and remedies set forth herein, including without limitation any partial undertaking on the part of Tenant

to cure any failure by Indemnitor, or of the Premises, or any prior occupant or prior owner thereof, to comply with any of the Environmental Legal Requirements, shall not obligate Tenant to complete such actions taken or require Tenant to expend further sums to cure such noncompliance. Tenant by making any payment or incurring any costs pursuant to this Article shall be subrogated to all rights of Indemnitor or any other prior occupant or prior owner of the Premises to seek reimbursement from any other person including, without limitation, any predecessor, owner or occupant of the Premises or any surrounding Premises who may be a "responsible party" under any of the Environmental Legal Requirements. Indemnitor hereby knowingly, voluntarily and intentionally waives and relinquishes to the fullest extent now or hereafter permitted by law: (A) all suretyship defenses and defenses in the nature thereof; (B) any right or claim of right to cause Tenant to proceed against any other "responsible party" before proceeding under this Article against Indemnitor or to require Tenant to proceed against the "responsible parties" in any particular order; (C) all rights and remedies, including, but not limited to, any rights of subrogation, contribution, reimbursement, exoneration or indemnification pursuant to any express or implied agreement, or now or hereafter accorded by applicable law to Indemnitor, its guarantors, sureties or accommodation parties; provided, however, unless Tenant otherwise expressly agrees in writing, such waiver by Indemnitor shall not be effective to the extent that by virtue thereof Indemnitor's liability under this Article or under this Lease is rendered invalid, voidable, or unenforceable under any applicable state or federal law dealing with the recovery or avoidance of so-called preferences or otherwise; (D) notice of the acceptance hereof, presentment, demand for payment, protest, notice of protest, or any and all notice of nonpayment, nonperformance, nonobservance or default or other proof or notice of demand whereby to charge Indemnitor therefor; (E) THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY PARTIES; THIS WAIVER BEING A MATERIAL INDUCEMENT FOR TENANT TO ACCEPT THE PROVISIONS OF THIS ARTICLE AND TO ENTER INTO THIS LEASE; (F) the pleading of any statute of limitations as a defense to Indemnitor's obligations hereunder; and (G) the benefit of all other provisions of law which may be validly waived. The liability of Indemnitor hereunder shall in no way be limited or impaired by: (1) any extensions of time for performance required by this Lease; (2) any amendment to or modification of this Lease; (3) any sale or assignment of the Lease or exercise of remedies thereunder or any sale, transfer or other conveyance of all or part of the Premises; (4) any exculpatory or other provision in this Lease limiting Tenant's recourse or limiting Tenant's rights to a judgment against Indemnitor; (5) the accuracy

or inaccuracy of any of the representations or warranties made by Indemnitor under this Lease or otherwise; (6) the release of Indemnitor or any other "responsible party" from performance or observance of any of the agreements, covenants, terms or conditions contained hereunder or in any of the other provisions or Article of this Lease by operation of law, by Tenant's voluntary act, or otherwise; (7) the filing of any bankruptcy or reorganization proceeding by or against Indemnitor, or any other "responsible party"; or (8) the invalidity or unenforceability of all or any portions of this Lease as to Landlord. Any of the foregoing may be accomplished with or without notice to Indemnitor and with or without consideration. Any termination of the Lease shall not terminate or otherwise affect Indemnitor's obligations hereunder and Indemnitor's obligations hereunder shall survive (A) any foreclosure, deed in lieu of foreclosure or reconveyance of any Mortgage or other exercise or remedies or action in lieu thereof, (B) any sale or other transfer of the Premises, (C) and any taking of the Premises by any governmental authority. The rights of Tenant under this Article shall be in addition to any other rights and remedies of Tenant against Indemnitor under any other provision or Article of this Lease or any other instrument now or hereafter executed by Indemnitor in connection with this Lease, or such other rights that Tenant may have at law or in equity (including, without limitation, any right of reimbursement or contribution pursuant to CERCLA), and shall not in any way be deemed a waiver of any of such rights. The obligations of Indemnitor under this Article shall be those of the Indemnitor, and its successors and assigns, and shall not run, and shall not be deemed to run, with the land. If any term or condition of this Article or any application thereof shall be invalid, illegal or unenforceable, the remainder of this Article and any other application of such term or condition shall not be affected thereby. No delay or omission in exercising any right hereunder shall operate as a waiver of such right or any other right. The provisions of this Article shall be binding upon Indemnitor, and its representatives, successors and assigns, including, without limitation, any assignee or purchaser of all or any portion of the Premises, and shall inure to the benefit of and be enforceable by Tenant and its representatives, successors, assigns, and subtenants. No failure or delay on the part of Tenant to exercise any power, right or privilege under this Article of this Lease shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege. No provision of this Article may be changed, waived, discharged or terminated except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought. Indemnitor shall have no obligation pursuant to the provisions of this Article to the extent that the presence of any Hazardous Materials on the Premises resulting in any Environmental Enforcement Action or in any condition or occurrence on the Premises that may constitute a violation of any of the Environmental Legal Requirements is

caused by Hazardous Materials which are deposited on the Premises by Tenant or Tenant's agents or servants or at Tenant's direction.

## ARTICLE XIV - SUBORDINATION

14.1 Subordination and Attornment. Tenant shall, upon five (5) days' prior written request by Landlord, subordinate this Lease to the lien of any present or future mortgage upon the Premises or any portion thereof, provided that the holder of any such mortgage ("the "Mortgagee") shall enter into a written agreement ("SNDA") with Tenant providing that (i) in the event of foreclosure or other action taken under the mortgage by Mortgagee, this Lease and the rights of Tenant hereunder shall not be disturbed, but shall continue in full force and effect so long as Tenant complies with the terms hereof; and (ii) such Mortgagee shall permit insurance proceeds to be used for any restoration and repair required by ARTICLE X of this Lease. As used herein, "mortgage" shall include mortgages, deeds of trust, deeds to secure debt, bonds or other similar instruments, and any modifications, extensions, renewals and/or replacements of same. Within forty (40) days after the execution of this Lease, Landlord shall provide Tenant, only if Tenant so requests and if so, at Tenant's sole expense, with (i) a Title Insurance Company title policy insuring Tenant's leasehold interest on the Premises, in an amount reasonably satisfactory to Tenant, subject only to the Permitted Exceptions, and (ii) an executed and recorded Memorandum of Lease and an executed and recorded SNDA from the holder of any mortgage to which this Lease is subordinate. Should any mortgagee of Landlord succeed to Landlord's interest through foreclosure or deed in lieu thereof, then Tenant shall attorn to such succeeding party as its landlord under this Lease promptly upon any such succession, provided that such succeeding party assumes all of Landlord's duties and obligations under this Lease, including without limitation the any and all obligations set forth in or arising under the provisions of Article XIII of this Lease. Such succeeding party shall not be liable for any of Landlord's obligations and duties hereunder prior to its assumption of Landlord's duties and obligations hereunder.

## ARTICLE XV - MISCELLANEOUS

15.1 Holding Over. In the event of Tenant's continued occupancy of the Premises after the expiration of the term of this Lease or any renewal or extension thereof, or any earlier termination provided or permitted by this Lease, with the consent of Landlord, such tenancy shall be from month-to-month and such continued occupancy shall not defeat Landlord's right to possession of the Premises. In the event Tenant continues to occupy the Premises after the expiration of the Lease term as renewed and/or extended without Landlord's consent. All covenants, provisions, obligations and conditions of this Lease shall remain in full force and effect during such month-to-month tenancy.

15.2 Non-Waiver of Default. No acquiescence by either party to any default by the other party hereunder shall operate as a waiver of its rights with respect to any other breach or default, whether of the same or any other covenant or condition, nor shall the acceptance of rent by Landlord at any time constitute a waiver of any rights of Landlord.

15.3 Recording. This Lease shall not be recorded. A short form or memorandum of this Lease describing the Premises and setting forth the term of this Lease and other non-monetary provisions may be recorded by either party, however, at the cost and expense of the party requesting such recording, and subject to the approval, as to content, of the other party, which approval shall not be unreasonably withheld.

15.4 Notice. Any notice or consent required to be given by or on behalf of either party to the other shall be in writing and mailed by registered or certified mail, return receipt requested or sent by pre-paid air courier or expedited mail service, addressed to the other party as follows:

| | |
|---|---|
| If to Landlord: | Town of Coventry<br>1670 Flat River Road<br>Coventry, RI 02816 |
| With a copy sent by similar means to: | Paul D. Sprague, Esquire<br>Cobleigh, Sprague & Giacobbe<br>70 Jefferson Boulevard<br>Warwick, RI 02888 |
| If to Tenant: | Commerce Park Associates 9, LLC<br>207 Quaker Lane<br>West Warwick, RI 02893<br>Attn: Anthony M. Traini, General Counsel |

or at such other address as may be specified from time to time in writing by either party. All such notices hereunder shall be deemed to have been given on the date of delivery or the date marked on the return receipt unless delivery is refused or cannot be made, in which case the date of postmark shall be deemed the date notice has been given.

15.5 Successors and Assigns. All covenants, promises, conditions, representations, and agreements herein contained shall be binding upon, apply, and inure to the parties hereto and their respective heirs, executors, administrators, successors, and permitted assigns.

15.6 Time is of the Essence. The time of the performance of all of the covenants, conditions, and agreements of this Lease and of any and all rules and

regulations issued pursuant hereto is of the essence of this Agreement.

15.7 Partial Invalidity. If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be held invalid, then the remainder of this Lease or the application of such provision to persons or circumstances other than those as to which it is held invalid shall not be affected thereby and each provision of this Lease shall be valid and enforced to the fullest extent permitted by law.

15.8 Headings, Captions and References. The section captions contained in this Lease are for convenience only and do not in any way limit or amplify any term or provision hereof. The use of the terms "hereof," "hereunder" and "herein" shall refer to this Lease as a whole, inclusive of the Exhibits, except when noted otherwise. The use of the masculine or neuter genders herein shall include the masculine, feminine and neuter genders and the singular form shall include the plural when the context so requires.

15.9 Brokerage Commissions. Landlord and Tenant each warrant and represent to the other that there are no brokers, finders fees or any real estate commissions due to any broker, agent or other party in connection with the negotiation or execution of this Lease or on behalf of either of them. Landlord and Tenant hereby agree to indemnify and hold the other harmless from and against any and all costs, expenses, liabilities, causes of action, claims or suits by any party for compensation, commissions, fees or other sums claimed to be due or owing with respect to the representation of Landlord or Tenant as applicable, in effecting this Lease.

15.10 Governing Law. This Lease shall be construed under the laws of the State of Rhode Island.

15.11 Force Majeure. The period of time during which either party is prevented or delayed in their observance, performance of the making of any improvements of repairs or of fulfilling any other obligation required under this Lease (other than the payment of Rent or other sums due by Tenant) due to unavoidable delays caused by fire, catastrophe, strikes or labor disputes, civil disorders, Acts of God or the public enemy, governmental prohibitions, notices of violations (present or future) or regulations or inability to obtain materials or reasonable substitutes by reason of such regulations, or other causes beyond a party's reasonable control, shall be added to a party's time for performance of the obligations and the party shall not be liable because of such delay or performance, provided that the delayed party has taken steps that are reasonable under the circumstances to mitigate the effects of such force majeure situation. Notwithstanding anything contained herein to the contrary, lack of adequate funds, increases in costs or financial inability to perform shall be deemed not to be a force majeure situation.

15.12 Submission of Instrument. Submission of this instrument for examination shall not be binding upon either party in any way and no lease obligation on the part of either party in any way to enter into a lease shall arise until this

instrument has been fully executed and delivered by Tenant and Landlord. Tenant's execution hereof shall constitute an offer, which may be accepted only by Landlord's execution and delivery hereof to Tenant. The "Effective Date" of this Lease shall be the date upon which the last party to execute same has properly done so.

15.13 Tenant's Authority. Tenant represents that, upon the date of execution of this Lease, it is, and throughout the term of this Lease it will be, authorized to do business in the State of Rhode Island, and Tenant agrees to furnish Landlord, upon request, evidence of authority for entering into this Lease. In the event Landlord becomes an entity which requires State authorization to do business, Landlord represents that it shall remain so authorized throughout the term of this Lease.

15.14 Relationship of Parties. Nothing contained herein shall be deemed or construed by the parties hereto nor by any third party as creating the relationship of principal and agent or of partnership or joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent or any other provision herein contained, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than Landlord and Tenant, and/or Indemnitor (Landlord) and Indemnified Party (Tenant).

15.15 Notice to Mortgagee. After receiving written notice from any person, firm or other entity that it holds a mortgage which includes as part of the mortgaged property the Premises or any portion thereof, Tenant shall, so long as such mortgage is outstanding, be required to give such holder of the same notices as may be given to Landlord under the terms of this Lease, but such notice may be given by Tenant to Landlord and such holder concurrently.

15.16 Estoppel Statement. So long as such request is no more frequently than commercially reasonable, except in the event of refinancing or sale of Landlord's interest in the Premises, or as may be required at any time by Landlord's Mortgagee, either party agrees within ten (10) days after request therefor by the other party to execute in recordable form and deliver to the requesting party a statement, certifying (a) whether or not this Lease is in full force and effect, (b) the date of commencement and termination of the term of this Lease, (c) the date to which rental and all other charges hereunder are paid currently without any offset or defense thereto (or stating any such offset or defense), (d) the amount of rental and all other charges hereunder, if any, paid in advance, (e) whether or not this Lease has been modified and, if so, identifying the modifications, and (f) that to Tenant's or Landlord's knowledge there are no uncured defaults by the other party or describing the claimed defaults.

15.17 Assignment of Rents. With reference to any assignment by Landlord of Landlord's interest in this Lease, or the rents payable hereunder, conditional in nature or otherwise for the purposes of financing and refinancing, Tenant consents thereto and agrees that the execution thereof by Landlord and the acceptance thereof by the holder or the exercise by such holder of its rights under such assignment shall never be deemed

an assumption by such holder of any of the obligations of Landlord hereunder, unless such holder shall, foreclose upon such financing and become fee owner of the Premises.

15.18 Mechanic's Liens. Tenant agrees to within a reasonable time discharge, any mechanic's, materialman's or other lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for or purported to be due for any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.

15.19 Independent Covenants. This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent and not dependent. Tenant shall not be entitled to any set off of the Rent or other sums charges or amounts owing hereunder against Landlord if Landlord fails to perform its obligations set forth therein, except as herein specifically set forth.

15.20 Security. Landlord shall not be responsible for security of Premises.

15.21 Entire Agreement. This Lease is the entire agreement between the parties and no modification thereof shall be made except in writing, signed by the parties.

IN WITNESS WHEREOF this Lease has been executed as of the day and year first above written.

TENANT:
COMMERCE PARK ASSOCIATES 9, LLC

By: ______________________, Manager

LANDLORD:
TOWN OF COVENTRY
By a Duly Constituted Majority of Its Elected Town Council pursuant to vote of May 3, 1999

______________________
Kevin McGee, President

______________________
James J. Spearman, Vice President

______________________
Dorothy C. Berube, Member

______________________
Ronald M. Wood, Member

______________________
Anna Mae Lapinski, Member