UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| STATE OF RHODE ISLAND, by and through the RHODE ISLAND DEPARTMENT OF ENVIRONMENTAL MANAGEMENT, Plaintiff, | : | |
| vs. | : | C.A. No. 05-346T-LDA |
| TOWN OF COVENTRY, et al., Defendants. | : | |

**DEFENDANTS COMMERCE PARK REALTY, LLC AND COMMERCE PARK ASSOCIATES 9, LLC'S PRETRIAL MEMORANDUM**

**Introduction**

Defendants Commerce Park Realty, LLC ("CPR") and Commerce Park Associates 9, LLC ("CPA/9") (collectively the "Commerce Parties") respectfully submit this Pretrial Memorandum, pursuant to the Pretrial Order filed on or about September 10, 2007. This Pretrial Memorandum concerns the October 15, 2007 trial scheduled in this Honorable Court with respect to liability only (and not damages) related to the Commerce Parties' Cross-Claims against Defendant Town of Coventry (the "Town") for (a) contractual indemnification, (b) breach of warranty, and (c) misrepresentation.

**A. Parties**[1]

1. Defendants Commerce Park Realty, LLC and Commerce Park Associates 9, LLC – Trial Counsel: Brian LaPlante, Esq., and Nicole M. Labonte, Esq., LaPlante Sowa Goldman

2. Defendant Town of Coventry – Trial Counsel: Geoffrey W. Millsom, Esq., Elizabeth M. Noonan, Esq., and Mark O. Denehy, Esq., Adler Pollock & Sheehan P.C.;

[1] A number of additional parties and counsel are involved in this lawsuit, yet are not directly involved with the specific liability issues which this Honorable Court will decide in this October 15, 2007 bench trial.

Michael A. DeSisto, Esq., DeSisto Law; Patrick J. Sullivan, Esq., Law Offices of Patrick J. Sullivan, Esq.

**B. Facts**

In or about May 1999, the Town leased a parcel of land formerly used as the Coventry Municipal Landfill (the "Property") to CPA/9, pursuant to a public vote of the Town Council for the Town of Coventry (the "Town Council") and the duly authorized execution of a written lease agreement (the "Lease"). The Property is immediately adjacent to another parcel of property (the "Adjacent Property") formerly owned by Defendant A. Cardi Realty Co., Inc. ("Cardi") and currently owned by CPR.[2]

Section 13.3 of the Lease contains a broad indemnification provision regarding hazardous and other waste materials, whereby the Town agreed to indemnify, defend, exonerate, protect, and save harmless the Commerce Parties (the "Indemnification Provision"). Pursuant to the Lease, the Town agreed, in pertinent part, that:

> [The Town] shall at its sole cost and expense indemnify, defend, exonerate, protect, and save harmless each Indemnified Party[3] ***against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or nature whatsoever, including, without limitation, attorneys' and experts' fees and disbursements***, which may at any time be imposed upon, incurred by or asserted

[2] On or about December 1, 1997, Interstate Options, LLC ("Interstate") and Cardi entered into an agreement whereby Interstate acquired an option to purchase the Adjacent Property, then owned by Cardi (the "Option Agreement"). Subsequently, in or about January 2000, Cardi transferred the Adjacent Property to Arnold Road. In or about March 2000, CPR, the successor to Interstate's rights under the Option Agreement, purchased the Adjacent Property from Arnold Road for Four Million and 00/100 Dollars ($4,000,000.00).

[3] Section 13.3 of the Lease defines **Indemnified Party** as follows: "Indemnified Party: (1) Tenant; (2) all those claiming by, through or under Tenant, including any subsequent assignee or subtenant; and (3) as to each of the foregoing, their respective affiliate, parent and subsidiary corporations, and, as applicable, the respective officers, directors, stockholders, agents, employees, accountants and attorneys of any one or more of them, and any person firm or entity which controls, is controlled by, controlling, or under common control with, any one or more of them, also sometimes described herein as 'Tenant,' which term is used interchangeably with and has the same meaning herein as the term 'Indemnified Party'." As a result, both of the Commerce Parties are indisputably beneficiaries of the Town's indemnification obligations.

> or awarded against [the Commerce Parties] or any other indemnified party and arising from or out of:
>
> > (A) any Hazardous Materials[4] on, in, under or affecting, all or any portion of the Premises on or before the date hereof, or which may hereafter affect all or any portion of the Premises, whenever discovered and however caused;
> >
> > (B) the violation of any Environmental Legal Requirements[5] by [the Town] or any third party, or with respect to the Premises, existing on or before the date hereof or which may so exist in the future, whenever discovered and however caused;
> >
> > (C) any breach of any representation or warranty made under or pursuant to this Article; and
> >
> > (D) the enforcement of the terms of this Article or the assertion by [the Town] of any defense to the obligations of [the Town] hereunder...specifically including therein, without limitation, the following: (1) costs incurred for any of the matters set forth in this Article; and (2) costs and expenses incurred in ascertaining the existence or extent of any asserted violation of any Environmental Legal Requirements relating to the Premises and any remedial action taken on account thereof. (Emphasis added.)

The Indemnification Provision clearly mandates that the Town indemnify and afford other relief to the Commerce Parties in a multitude of circumstances. The Town is further required to comply with and "cure or eliminate" any violation of an Environmental Legal Requirement, and

---

[4] Section 13.3 of the Lease defines **Hazardous Materials** as follows: "Hazardous Materials: means and includes, but is not limited to, any petroleum product and all hazardous or toxic wastes or substances, any substance which because of their quantitative concentration, chemical, radioactive, flammable, explosive, infectious or other characteristics, constitute or may reasonably be expected to constitute or contribute to a danger or hazard to public health, safety or welfare or to the environment, including, without limitation, any asbestos (whether or not friable) and any asbestos-containing materials, waste oils, solvents and chlorinated oils, polychlorinated biphenyls (PCB's), other carcinogens, toxic metals, etchants, pickling and plating wastes, explosives, reactive metals and compounds, pesticides, herbicides, radon gas, urea formaldehyde foam insulation and chemical, biological and radioactive wastes, or any other similar materials or any 'hazardous' or 'toxic' wastes or substances which are included under or regulated by any Environmental Legal Requirements."

[5] Section 13.3 of the Lease defines **Environmental Legal Requirements** as follows: "Environmental Legal Requirements: all applicable past (which have current effect), present or future federal, state, county and local laws, by-laws, rules, regulations, codes and ordinances, or any judicial or administrative interpretations thereof, and the requirements of any Governmental Authority, pertaining to the regulation or protection of the environment, or the health and safety of persons and property, or relating in any way to Hazardous Materials (or the existence, release, use, discharge, disclosure or disposal thereof)."

remove or contain ***any*** "Hazardous Materials in full compliance with and as required by any Environmental Enforcement Action or applicable Environmental Legal Regulations,"[6] whether or not caused by any action of the Town. Additionally, the Indemnification Provision states that if the Town fails to indemnify the Commerce Parties, and the Commerce Parties take any action that is required of the Town pursuant to the Indemnification Provision, any and all "[costs associated with] environmental consultants, and experts, fees and expenses, attorneys, fees and expenses, court costs and all costs of assessment, monitoring, clean-up, containment, remediation, removal and restoration" are deemed an obligation of the Town, accruing interest at rate of ten percent (10%) per year, and are "*secured by a lien on all other property of* [the Town] *as fully and as effectively and with the same priority as every other obligation secured thereby.*" (Emphasis added.)

The Property and the Adjacent Property are part of the Centre of New England (the "Centre"), a large-scale residential, commercial and retail development of the Commerce Parties and their affiliates spanning the Towns of Coventry, West Greenwich, and East Greenwich. The Centre is one of the largest such developments in New England, and has added a sorely-needed tax base for its host towns, as well as the State of Rhode Island at large. The Town agreed to lease the Property to CPA/9 so that the Commerce Parties could control the brush burning activity on the site, and thus eliminate any deterrent or impediment to the development of the Centre. As such, the comprehensive Indemnification Provision was an inducement to sign the

---

[6] Section 13.3 of the Lease defines **Environmental Enforcement Action** as follows: "Environmental Enforcement Action: all actions, orders, requirements or liens instituted, threatened, required, completed, imposed or placed by any Governmental Authority and all claims made or threatened by any other person against or with respect to the Premises, or any present or past owner or occupant thereof, arising out of or in connection with any of the Environmental Legal Requirements, any environmental condition, or the assessment, monitoring, clean-up, containment, remediation or removal of, or damages caused or alleged to be caused by, any Hazardous Materials
(1) located on or under the Premises or any surrounding property,
(2) emanating from the Property or any surrounding property, or
(3) generated, stored, transported, utilized, disposed, managed, or released by any Indemnitor (whether or not on, under or from the Property or any surrounding property)."

Lease, giving the Commerce Parties the required security that the Town would affirmatively address all contamination issues and damages associated therewith, and protect the Commerce Parties, the citizens of the Town, and the economic development at the Centre with respect to the Town's former landfill. In fact, the Indemnification Provision expressly states that CPA/9 "has therefore required the inclusion of [the Indemnification Provision] as a condition precedent to [CPA/9's] execution [of the Lease] in order to protect [CPA/9] from any such liabilities, costs and.or expenses, and [CPA/9] would not be willing to enter into [the] Lease in the absence of the inclusion [therein] of [the Indemnification Provision]."

The Town also made certain representations and warranties in Section 13.3 of the Lease (collectively the "Warranties"), which were "to be true as of the date [of the Lease] and throughout the period that [the] Lease shall remain in force and effect, and for as long thereafter as [CPA/9] may be potentially liable therefor." The Town represented and warranted, *inter alia*, that "no Hazardous Materials have been or are currently generated, stored, transported, utilized, disposed of, managed, released or located on, under or from the [Property]," and that the Town "has no knowledge of any of the foregoing conditions, defects, liens, notices or other matters described [in the above Indemnification Provision] as to any adjacent Premises or other Premises which might, by virtue of movement of Hazardous Materials or otherwise, have a material adverse effect on the [Property]." Like the Indemnification Provision, the Warranties induced the Commerce Parties to enter into the Lease with the Town.

Despite reasonable diligence by the Commerce Parties prior to, during, and after executing the Lease, until approximately 2002, the Commerce Parties had no knowledge of (a) the extent of the dumping of hazardous materials and contamination at the Property, or (b) any dumping at the Adjacent Property. In or about 2002, during the continued development

of the Centre, the Commerce Parties discovered the existence of extensive hazardous materials at the Property and Adjacent Property, thereby triggering the Indemnification Provision.

Upon making such discovery, in or about March 2002, Interstate and the Commerce Parties filed a Complaint in the Rhode Island (Kent County) Superior Court against Cardi, Arnold Road, and other Cardi affiliates, concerning the hazardous materials discovered at the Adjacent Property, in *Interstate Options, LLC, et al. vs. A. Cardi Realty Associates, et al.*, Civil Action No. 02-303 (the "State Case"). Likewise, on or about August 7, 2002, the Commerce Parties made a demand for indemnification and other protection upon the Town pursuant to the Lease, by and through their counsel. The Town never once responded to this demand in the ensuing four and one half (4½) years, despite the Town's affirmative obligation to indemnify, and afford other protection and compensation to, the Commerce Parties. In or about February 2004, the Commerce Parties amended their Complaint in the State Case, adding direct claims against the Town incidental to, among other objectives, enforcing the terms of the Indemnification Provision.[7]

On or about August 16, 2005, the State of Rhode Island, by and through the Rhode Island Department of Environmental Management ("RIDEM"), filed the instant action in this Honorable Court against numerous "potentially responsible parties" (the "PRPs"), including the Town, alleging significant contamination at the Property and Adjacent Property. RIDEM asserted, among other allegations, that the PRPs were liable for the dumping of hazardous and other materials and the discharge of pollutants into State waters from the Property (the "Contamination"). RIDEM demanded, among other relief, that the PRPs (a) reimburse RIDEM and the State of Rhode Island for any and all costs incurred by RIDEM and the State regarding the Contamination, including legal fees and interest, (b) restore the quality of groundwater

[7] The Cardi Defendants had earlier asserted third-party claims against the Town in the State Case.

affected by the Contamination, and (c) perform investigation and remediation of the Contamination. Further, RIDEM sought a judgment that the PRPs were liable for all future costs associated with the Contamination, and a declaration that the PRPs had violated numerous Rhode Island laws.

In connection with the instant suit, the PRPs' appointed spokesperson requested entry by its contractors onto the Property (leased by CPA/9) and Adjacent Property (owned by CPR) to investigate the presence of hazardous materials and contamination. The PRPs' spokesperson and the Commerce Parties then began negotiating an access agreement (the "Access Agreement") in furtherance of allowing the PRPs' contractors' requested access, but providing the Commerce Parties with protection from potential premises liability and addressing other customary concerns of landowners and lessees with knowledge of such activities on their properties. The Commerce Parties never once objected to granting access to the Town; they merely sought, from the PRPs, reasonable assurances regarding the access of the PRPs and RIDEM to the Property and Adjacent Property, including that the contractors hired to perform work possessed proper insurances and that the Commerce Parties' liability would be reasonably limited.

On or about February 15, 2006, during the pendency of the Access Agreement negotiations, RIDEM moved to amend its Complaint in the instant case to add the Commerce Parties as defendants and PRPs, which relief was granted on or about March 6, 2006. On or about March 14, 2006, RIDEM filed its First Amended Complaint in this Honorable Court, alleging against the Commerce Parties all of the above-mentioned claims that RIDEM had earlier asserted against the PRPs (e.g. reimbursement of costs and investigation/remediation of the Contamination).

Thereafter, the Commerce Parties, due to having been targeted by RIDEM as being responsible for the "investigation and remediation of the Contamination," demanded on six (6) separate occasions that the Town and/or the Town's insurer honor the Indemnification Provision. The Commerce Parties sent these demands to the Town on or about March 27, 2006, April 14, 2006, April 18, 2006, May 4, 2006 and May 8, 2006. The Town, after having inexplicably ignored the Commerce Parties' initial indemnification demand on August 7, 2002, and denying liability in its Answer in the State Case, ignored the Commerce Parties' multiple requests for indemnification in 2006, forcing the Commerce Parties to incur significant costs in defending the present action and pursuing the enforcement of the Indemnification Provision both in the State Case and in the instant matter. These costs incurred by the Commerce Parties are all costs for which the Town agreed to compensate the Commerce Parties pursuant to the Indemnification Provision of the Lease.

The Commerce Parties and the PRPs executed the Access Agreement on or about June 26, 2006, granting access to the Property and Adjacent Property for remedial investigation and affording the reasonable protection earlier sought by the Commerce Parties. As a result, RIDEM's previously filed motion for judicial relief concerning access was withdrawn by stipulation on or about June 26, 2006 (the "Stipulation").

Despite that the execution of the Access Agreement and the filing of the Stipulation were only mere days away, and the Town was a signatory to the Stipulation, on or about June 22, 2006, the Town filed yet another suit in the Rhode Island (Kent County) Superior Court, *Town of Coventry v. Commerce Park Associates 9, LLC*, C.A. 06-579 (the "Coventry Suit"). The 2006 Coventry Suit alleged the failure of CPA/9 to allow the PRPs' immediate, unfettered access to the Property (without any reasonable safeguards for the Commerce Parties), four (4) years after

the Town had breached its indemnification obligations by ignoring the Commerce Parties' demands for relief under the Lease. In its Complaint in the Coventry Suit, the Town also affirmatively asserted that the Lease "is a valid and binding contract between [the Town] and [CPA/9]." Further, the Town admitted in the Coventry Suit that the Town was obligated to indemnify the Commerce Parties pursuant to the Lease.

CPA/9 responded to the Coventry Suit by filing a Motion to Dismiss on the grounds that the Town failed to state a cause of action because, among other bases, the negotiations between the Commerce Parties and the PRPs to allow access did not constitute a breach of the Lease. The Town did not file a responsive pleading, but instead voluntarily dismissed its claims in the Coventry Suit on or about September 13, 2006.

Although the investigatory process emanating from the instant suit is not yet completed, and, as a result, the scope of the Commerce Parties' damages are not yet fully ascertainable,[8] in February 2007, engineering firm Woodard & Curran conducted a Site Investigation at the Property for the PRPs, which investigation confirmed that hazardous waste does in fact exist at the Property and Adjacent Property (the "2007 Site Investigation"). The 2007 Site Investigation confirmed that several contaminants, including, but not limited to, chlorobenzene, arsenic, beryllium, lead, thallium, and methane gas, exist at the Property and Adjacent Property. These contaminants are undeniably within the definition of hazardous materials as stated in the Indemnification Provision of the Lease.

Moreover, as the Commerce Parties are now aware, the Town has clearly known for decades that significant hazardous waste exists at and around the Property. In the 1980s, site

[8] While the Commerce Parties' damages are not yet fully ascertainable, the Commerce Parties are entitled to protection and compensation with respect to such losses the Commerce Parties will clearly sustain in the future. The October 15, 2007 trial will be heard solely on the issue of the Town's liability to the Commerce Parties, and not with respect to damages.

investigations conducted by either RIDEM or the United States Environmental Protection Agency showed the presence of chemicals and other waste materials, which are well within the definition of hazardous wastes as set forth in the Indemnification Provision of the Lease.

**C. Claims and Defenses**

1. COUNT I – Contractual Indemnification

Pursuant to the Indemnification Provision, the Town agreed to indemnify, defend, exonerate, protect, and save harmless the Commerce Parties with respect to hazardous and other waste materials discovered at the Property and Adjacent Property. The Town further agreed to comply with and cure or eliminate any violation of an Environmental Legal Requirement, and remove or contain any hazardous materials in full compliance with and as required by any Environmental Enforcement Action or applicable Environmental Legal Regulations, whether or not caused by any action of the Town. Additionally, the Town agreed that if it failed to indemnify the Commerce Parties, and the Commerce Parties were forced to take any action that is required of the Town pursuant to the Indemnification Provision, any and all costs associated with environmental consultants and experts, fees and expenses, attorneys' fees and expenses, court costs, and all costs of assessment, monitoring, clean-up, containment, remediation, removal and restoration would be deemed an obligation of the Town.

At no time has the Town ever acknowledged its liability under the Indemnification Provision, in any respect, to the Commerce Parties. The Town has breached the express terms of, and should be compelled to comply with, the Indemnification Provision in the Lease, based upon the following: (a) refusing to indemnify the Commerce Parties despite their numerous demands for the same, beginning in 2002; (b) forcing the Commerce Parties to enforce their rights in the State Case; and (c) failing to provide for the Commerce Parties' legal defense in this

case. As a direct and proximate result of the Town's breach, the Commerce Parties have suffered, and will continue to suffer, substantial damages.

2. COUNT II – Breach of Warranty

The Town agreed to the Warranties in the Lease, representing to the Commerce Parties that (a) no Hazardous Materials had been or were, at the time of the execution of the Lease, generated, stored, transported, utilized, disposed of, managed, released or located on, under or from the Property, and (b) the Town had no knowledge of any Hazardous Materials as to any adjacent premises (e.g. the Adjacent Property). In making such promises, the Town induced the Commerce Parties to enter into the Lease, and the Commerce Parties reasonably relied on such Warranties in taking possession of the Property and Adjacent Property.

The Town's Warranties were false, and now must indemnify the Commerce Parties for damages resulting from this variation between what was promised by the Town, and what actually came to pass, namely, that there always were, in fact, significant hazardous materials at the Property and Adjacent Property. As the Commerce Parties are now aware, it has been clear for decades that hazardous waste exists at and around the Property. Because the Town knew that the Property and Adjacent Property contained pervasive hazardous materials, the Town breached the Warranties of the Lease. As a direct and proximate result of the Town's breach of the Warranties, the Commerce Parties have suffered, and will continue to suffer, substantial damages.

3. COUNT III – Misrepresentation

The Town, acting by and through its agents and representatives, as well as in the Warranties, falsely represented the condition of the Property and Adjacent Property to the Commerce Parties when the parties executed the Lease, including, but not limited to, with

respect to the presence of hazardous materials at the Property and Adjacent Property. As the Commerce Parties are now aware, it has been clear for decades that significant hazardous waste exists at and around the Property. When it entered into the Lease, the Town knew that the Property and Adjacent Property contained hazardous materials.

The Town's misrepresentations were material and made for the purpose of inducing the Commerce Parties to rely upon said misrepresentations in entering into the Lease. In turn, the Commerce Parties reasonably relied upon said misrepresentations, to their detriment. As a direct and proximate result of the Town's misrepresentations, the Commerce Parties have suffered, and will continue to suffer, substantial damages.

**D. Damages**

Notwithstanding (a) this Honorable Court's Bench Trial Notice issued on or about September 10, 2007, notifying all parties to the instant action that this Court will hear evidence and arguments at trial only with respect to the issue of the Town's liability to the Commerce Parties regarding the Commerce Parties' Cross-Claims against the Town, and not with respect to the issue of damages, and (b) the fact that the Commerce Parties' are not yet fully ascertainable, the Commerce Parties' damages include the following, among other losses.

First, the Commerce Parties have incurred substantial costs, including without limitation legal fees, in connection with the management of the legal and financial issues arising as a result of the ongoing requirement that the Commerce Parties evaluate and remediate the presence of hazardous materials at the Property and Adjacent Property. In addition, the Commerce Parties have incurred consequential damages in the form of revenue lost in connection with the commercial development of the Centre, which development was partially halted due to the presence of hazardous materials at the Property and Adjacent Property. Finally, the Commerce

Parties have incurred damages in the form of exponential legal fees paid to defend the instant lawsuit and prosecute the State Case, which legal fees the Town is obligated to pay pursuant to the Indemnification Provision of the Lease.

**E. Issues**

1. Whether an Indemnification Provision contained in a duly executed Lease, entered into by the Town pursuant to a valid public vote of the Town Council, is enforceable.

2. Whether the Town is required to fully indemnify the Commerce Parties with respect to all matters concerning the presence of hazardous materials at the Property and Adjacent Property, based upon the plain, unambiguous, and express terms of the Lease, as well as the Town's admission in the Coventry Suit that it is obligated to indemnify the Commerce Parties pursuant to the Lease.

3. Whether the Town breached its Warranties to the Commerce Parties, as contained in the Lease, in guaranteeing that no hazardous materials were present at the Property or Adjacent Property, when the Town knew, based upon its control of the Property for decades, that the Property and Adjacent Property contained significant hazardous materials.

4. Whether the Town, acting by and through its agents and representatives, as well as in the Warranties, falsely represented the condition of the Property and Adjacent Property to the Commerce Parties, when the Town knew, based upon its control of the Property for decades, that the Property and Adjacent Property contained significant hazardous materials.

5. Whether the Lease, which the Town has already admitted is a valid and binding contract between the Town and CPA/9 in its Complaint filed in the Coventry Suit, is in fact a valid, binding, and enforceable contract between the parties, despite the Town's allegation that the Lease is unenforceable due to a purported failure of consideration.

6. Whether the Town's acknowledgement in the Lease that it actually received valuable and sufficient consideration estopps the Town from alleging a purported failure of consideration.

7. Whether the Commerce Parties complied with the Lease concerning the provision of access to the Town, which access is not specifically called for in the Lease, by (a) never once objecting to granting access to the Town, (b) executing and delivering the Access Agreement providing for such access, and (c) resolving such access issues well within the cure period provided for in the Lease.

8. Whether hazardous materials in fact exist at the Property and Adjacent Property, so as to trigger the Town's obligations under the Indemnification Provision of the Lease, as the Town has known for decades and the PRPs' 2007 Site Investigation has recently been confirmed.

9. Whether the Town had the legal authority to enter into the Lease, based upon the public vote of the Town Council, the Town Resolution authorizing that the Town enter into the Lease with CPA/9, and the execution of the Lease by the Town's authorized officials.

**F. Arguments**

1. COUNT I – Contractual Indemnification

The Lease is a valid and binding contract between the Commerce Parties and the Town, requiring the Town to indemnify, defend, exonerate, protect, and save harmless the Commerce Parties. Indeed, when the Town filed the Coventry Suit alleging that CPA/9 breached the Lease, the Town affirmatively asserted that the Lease "is a valid and binding contract between [the Town] and [CPA/9]." Further, the Town asserted that it was obligated to indemnify the Commerce Parties pursuant to the Lease. It is well settled under Rhode Island law "that facts admitted in the pleadings are held as true against the pleader." State of Rhode Island v.

Piedmont Funding Corp., 119 R.I. 695, 699 (1978) (citing Ogden v. Rabinowitz, 86 R.I. 294, 300 (1957)). As such, the Town is estopped from claiming otherwise in the instant matter.

Moreover, the Town possessed, and appropriately exercised, the authority to execute the Lease, and, therefore, the Lease and the Indemnification Provision are valid and enforceable. The Town's execution of the Lease was authorized by state statute, local ordinance, and a public vote of the Town Council. Rhode Island General Laws § 45-2-4 imbues cities and towns with the broad authority to:

> take, purchase, and hold real and personal property, and alienate and convey the property…and may make all contracts, including lease or lease-purchase agreements of real and personal property, necessary and convenient for the transaction of the business of the city or town.

The Town's Home Rule Charter (the "Charter") further solidifies the Town's authority to execute such a Lease. Article I, Section 1.04 of the Charter explicitly states that:

> The town may acquire property within or without its corporate limits for town purposes, in fee or any lesser interest or estate, by purchase, lease, gift, devise, by condemnation within the town, for public use, and may hold, manage and control, and *may sell, lease, and convey such property as its interests may require.* (Emphasis added.)

Article III, Section 3.14 of the Charter vests the powers of the Town, including those articulated in Article I, Section 1.04 regarding the disposition of Town property, in the Town Council. The Charter was subsequently "ratified, confirmed, validated and enacted" by Part II, Article 1, Section 1 of the Code of the Town of Coventry. As such, the Town Council possessed the authority to execute the Lease, and it must now comply with its contractual obligations.

When a public body such as the Town (or City) Council possesses and properly exercises the power to lease town or city property, that town or city is then liable to the other contracting party according to the terms of that lease. Raymond Construction Co., Inc. v. Bisbano, 114 R.I. 1, 12 (1974). Here, the Town Council, imbued with the authority to dispose of Town property,

convened a properly noticed public meeting on May 10, 1999, for the purpose of discussing the execution of the Lease, among other matters (the "Public Meeting"). The Town Council discussed with Town Solicitor Paul Sprague, before the public, the Lease and the "Town's liability with regards (sic) to dumpsite."

Following this public discussion, Councilman James J. Spearman moved that the Town Council adopt a resolution allowing the Town Council President to execute the Lease. The motion was seconded and the resolution was *unanimously* passed. The resolution, identified as Resolution of the Town Council No. 43-99-3010 (the "Resolution"), authorized Town Council President Kevin McGee to execute the Lease. The Lease was subsequently executed by Mr. McGee, and all the other Town Council members, as well as CPA/9. The Resolution was then recorded in the Town of Coventry Book of Resolutions, attached to which was a copy of the Lease.[9]

The Rhode Island Supreme Court recognized, in the case of Sousa v. Town of Coventry, 774 A.2d 812 (R.I. 2001), that the Town Council possesses the power to authorize the execution of a lease of Town property to a private entity. Id. at 815. In Sousa, the Rhode Island Supreme Court asserted that the Coventry Town Manager acted within his authority to execute a lease of Town property to a private party, based upon the Town Council having specifically authorized that action at a public meeting. Id. at 813, 815. The factual circumstances surrounding the execution of the Lease in the instant matter are virtually identical. The Town Council specifically authorized the Town Council President to execute the Lease with CPA/9. Pursuant

---

[9] Notably, the Town Council simultaneously approved and executed a lease agreement concerning property owned by CPA/9's affiliate pursuant to the very same Resolution, which lease the Town recently recorded in the Land Evidence Records as being valid and enforceable (the "Softball Lease"). As the Softball Lease and the Lease concerning the landfill were authorized via the same public process and Resolution, the Town's assertion that the Softball Lease is valid necessarily estopps the Town from denying the validity of the Lease at issue in this matter.

to this appropriate grant of authority, the Town Council President, along with the other Town Council members, executed the Lease. The Town Council appropriately exercised the power granted to it by R.I.G.L. § 45-2-4, the Charter and the Code of the Town of Coventry, and recognized by the Rhode Island Supreme Court in Sousa.

The Town is estopped from denying the validity of the Lease because the Town Council specifically and appropriately authorized the execution of the Lease at a properly noticed Public Meeting, and the Lease was executed pursuant to that grant of authority. The Commerce Parties are therefore entitled to rely upon the representations of the Town made in the Lease, including the Indemnification Provision, and at the Public Meeting. The Rhode Island Supreme Court has long recognized that the doctrine of estoppel may be applied against a public agency to prevent fraud or injustice. Ferrelli v. Dept. of Employment Security, 106 R.I. 588, 593 (R.I. 1970); see also Murphy v. Duffy, 46 R.I. 210 (1924); El Marocco Club, Inc. v. Richardson, 746 A.2d 1228 (R.I. 2000); Casa DiMario, Inc. v. Richardson, 763 A.2d 607 (R.I. 2000).

Furthermore, the mandates of the Indemnification Provision are clear and unambiguous. The Town is explicitly required, among other covenants, to indemnify, defend, exonerate, protect, and save harmless the Commerce Parties for any and all costs arising from the presence of hazardous materials at the Property and Adjacent Property. When "contractual language is unambiguous, the intention of the parties must govern 'if that intention can be clearly inferred from the writing . . . .'" A.F.Lusi Construction, Inc. v. Peerless Insurance Co., 847 A.2d 254, 258 (R.I. 2004) (quoting W.P. Assocs. v. Forcier, Inc., 637 A.2d 353, 356 (R.I. 1994)); see also Intergen N.V. v. Eric F. Grina, Alstom (Switzerland) Ltd., 344 F.3d 134, 146 (1st Cir. 2003) ("[C]ourts ought not to distort the clear intention of contracting parties or reach conclusions at odds with the unambiguous language of a contract").

It is utterly impossible to assert that the language of the Lease, and the Indemnification Provision in particular, is ambiguous or susceptible of more than one reasonable interpretation, and to do so would be disingenuous. When a Court determines whether the language of a contract "is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning." W.P. Assocs. v. Forcier, Inc., 637 A.2d 353, 356 (R.I. 1994); see also Affiliated FM Insur. Co. v. Employers Reinsurance Corp., 2004 U.S. Dist. LEXIS 27961, *26-27 (D.R.I. 2004); URI Cogeneration Partners, L.P., et al. v. Bd. of Governors for Higher Educ., 915 F. Supp. 1267, 1281-82 (D.R.I. 1996); Almacs Inc. v. Drogin, 771 F. Supp. 506, 510 (D.R.I. 1991). A Court will find a contract ambiguous only when it is "*reasonably and clearly* susceptible to more than one interpretation." Rubery v. The Downing Corp., 760 A.2d 945, 947 (R.I. 2000) (emphasis added). Once a Court determines that the contractual language is clear and unambiguous, as it is here, "the task of judicial construction is at an end and the agreement must be applied as written." W.P. Assocs., 637 A.2d at 356.

Here, nothing within the four (4) corners of the Lease lends it to more than one interpretation. The parties' intentions are clearly articulated on the face of the document, obviating the complicating task of parsing contractual language to determine intent. It is clear that the substantial costs incurred by the Commerce Parties in (a) enforcing the Indemnification Provision through this action and the State Case, (b) defending against the claims of RIDEM, and (c) addressing the Contamination affecting the Property and Adjacent Property, are all included in the subject matter of the Indemnification Provision.

Furthermore, CPA/9 has honored its obligations pursuant to the Lease and has proceeded in good faith with respect to those obligations, including with respect to granting access to the Property and Adjacent Property. CPA/9 has honored its obligations under the Lease despite that

the Town breached the Lease years ago by failing to indemnify the Commerce Parties, causing any obligation of CPA/9 to allow access to the Town or the PRPs, for which the Lease does not provide, to be effectively discharged. Aiello Construction, Inc. v. Nationwide Tractor Trailer Training and Placement Corp., 122 R.I. 861, 866 (1980).

The Town, on the other hand, breached the Indemnification Provision of the Lease by failing to indemnify the Commerce Parties for the remediation of the Contamination, the defense of the instant case and the prosecution of the State Case, and by forcing the Commerce Parties to seek judicial redress to enforce the Indemnification Provision in the instant action and the State Case. The Indemnification Provision provides broad protections for the Commerce Parties, and served as an inducement to CPA/9 to execute the Lease for the Property, a former landfill. Despite its clear and unambiguous language, the Town has failed to satisfy numerous mandates of the Indemnification Provision, thereby breaching the Lease and causing severe and substantial damages to the Commerce Parties. The Town's failure to indemnify and protect the Commerce Parties as required by the Lease constitutes a breach of the Lease, for which the Town must be made accountable.

The Town must compensate the Commerce Parties for their costs incurred to date in the judicial proceedings and otherwise, and be required to affirmatively reimburse the Commerce Parties going forward. Further, the Town must indemnify the Commerce Parties for all further and not yet ascertained losses incurred as a result of the hazardous materials at the Town Property and Adjacent Property. See Boston Gas Co. v. Century Indemnity Co., 2006 U.S. Dist. LEXIS 41133, at *12 (D. Mass. June 21, 2006); Rockwell Int'l Corp. v. IU Int'l Corp., 702 F. Supp. 1388, 1387-88 (N.D. Ill. 1988).

2. COUNT II – Breach of Warranty

The Rhode Island courts apparently have not had occasion to examine a breach of express warranty claim with respect to a rental contract for real property. In a different factual context, however, "Rhode Island law requires that in order to establish breach of an express warranty, the plaintiff has the burden of proving that the statements or representations made by the seller induced plaintiff to purchase the product and that he/she relied upon such statements or representations." Ralston Dry-Wall Co. v. United States Gypsum Co., 740 F. Supp. 926, 929 (D.R.I. 1990); see Thomas v. Amway Corp., 488 A.2d 716, 720 (R.I. 1985); Rogers v. Zielinski, 99 R.I. 599, 602, 209 A.2d 706, 708 (1965).

Similarly, under analogous Massachusetts law, "as elsewhere, an express warranty in a contract is a promise of a particular standard of performance, and it imposes on the warrantor an obligation to fulfill the promise made. . . . In effect, the warrantor proposes to indemnify the warrantee for any damage resulting from a variation between what was promised and what actually came to pass." Sparks v. Fid. Nat'l Title Ins. Co., 294 F.3d 259, 272 (1st Cir. 2002).

Here, the Town included the Warranties in the Lease, representing to the Commerce Parties that (a) no Hazardous Materials had been or were, at the time of the execution of the Lease, generated, stored, transported, utilized, disposed of, managed, released or located on, under or from the Property, and (b) the Town had no knowledge of any hazardous materials as to any adjacent premises (e.g. the Adjacent Property). In making such promises, the Town induced the Commerce Parties to enter into the Lease, and the Commerce Parties reasonably relied on such Warranties in taking possession of the Property and Adjacent Property.

The Town failed to fulfill the Warranties made in the Lease, and now must indemnify the Commerce Parties for damages resulting from this variation between what was promised by the

Town, and what actually came to pass, namely, that there always were, in fact, hazardous materials at the Property and Adjacent Property. Moreover, as the Commerce Parties are now aware, it has been clear for decades that hazardous waste exists at and around the Property. Because the Town knew that the Property and Adjacent Property contained pervasive hazardous materials, the Town breached the Warranties of the Lease. As a direct and proximate result of the Town's breach of the Warranties, the Commerce Parties have suffered, and will continue to suffer, substantial damages.

3. COUNT III – Misrepresentation

To prove misrepresentation, the Commerce Parties must prove that the Town intended to produce a false belief in the Commerce Parties' minds with the intent that they would act upon such misrepresentation. See B.S. Internat'l Ltd. v. Licht, 696 F. Supp 813, 827 (D.R.I. 1988); Internat'l Shoe, Co. v. Berick, 55 R.I. 333, 335, 181 A. 297 (1940); Halpert v. Rosenthal, 107 R.I. 406, 412, 267 A.3d 730, 734 (1970); Home Loan & Investment Ass'n v. Paterra, 105 R.I. 763, 768, 255 A.2d 165, 167-68 (1970). The Town is similarly liable for misrepresentation if the Town omitted certain material facts in its dealings with the Commerce Parties. See B.S. Internat'l Ltd., 696 F. Supp at 827; Handy v. Waldron, 18 R.I. 567, 570, 29 A. 143 (1894).

Here, the Town, acting by and through its agents and representatives, as well as in the Warranties, falsely represented the condition of the Property and Adjacent Property to the Commerce Parties when the parties executed the Lease, including, but not limited to, with respect to the presence of hazardous materials at the Property and Adjacent Property. As the Commerce Parties are now aware, it has been clear for decades that hazardous waste exists at and around the Property. When it entered into the Lease, the Town either knew, or should have

known, that the Property and Adjacent Property contained hazardous materials, yet represented the exact opposite to the Commerce Parties in the Lease.

In addition, the Town's agents and officers made affirmative representations to the Commerce Parties, intending to induce CPA/9 to execute the Lease. The Town and its agents and officials were acting within their well-founded powers in making these representations and in authorizing and executing the Lease. As such, the Commerce Parties were justified in relying upon the representations made by the Town. But for the Indemnification Provision, CPA/9 would not have executed the Lease and assumed the potential liability associated with controlling a former landfill.

The Town's misrepresentations were material and made for the purpose of inducing the Commerce Parties to rely upon said misrepresentations in entering into the Lease. In turn, the Commerce Parties reasonably relied upon said misrepresentations, to their detriment. As a direct and proximate result of the Town's misrepresentations, the Commerce Parties have suffered, and will continue to suffer, substantial damages.

**G. Pending Matters**

This Honorable Court should consider the Commerce Parties' Motion in *Limine* to preclude parol evidence regarding the parties' obligations, conditions, and/or rights under the express terms of the fully integrated Lease. This Court's analysis of the parol evidence rule is governed by Rhode Island law. See, e.g., Erie R.R. v. Tompkins, 304 U.S. 64 (1938); Demirs v. Plexicraft, Inc., 781 F. Supp. 860 (D.R.I. 1991); Inleasing Corp. v. Jessup, 475 A.2d 989, 993 (R.I. 1984); Fram Corp. v. Davis, 121 R.I. 583, 587, 401 A.2d 1269, 1272 (1979).

Applicable to completely integrated agreements, see City of Warwick v. Boeng Corp., 472 A.2d 1214, 1219 (R.I. 1984), the parol evidence rule "prohibits introduction of extrinsic

evidence to change, vary, or alter the written terms of an agreement, unless the evidence is offered to show fraud, mistake, or a condition precedent to the existence of the contract." Lisi v. Marra, 424 A.2d 1052, 1055 (R.I. 1981); see Inleasing Corp., 475 A.2d at 993; Fram Corp., 121 R.I. at 586-87, 401 A.2d at 1272. A document is integrated where the parties thereto adopt the writing as the final and complete express of the agreement. Wells v. Uvex Winter Optical, 635 A.2d 1188, 1192 (R.I. 1994). "Parol evidence may also be admitted to supplement an agreement that is incomplete or ambiguous on its face." Id. (quoting Lisi, 424 A.2d at 1055).

Here, the Lease is an integrated agreement. The terms of the Lease are clear and unambiguous, and nothing within the four (4) corners of the Lease lends it to more than one interpretation. The parties' intentions are clearly articulated on the face of the document, obviating the complicating task of parsing contractual language to determine intent. Moreover, Section 15.21 of the Lease contains an integration clause, stating the Lease "is the entire agreement between the parties and no modification thereof shall be made except in writing, signed by the parties." Therefore, this Honorable Court should prohibit the introduction of extrinsic evidence to change, vary, or alter the written terms of the Lease, including without limitation the Indemnification Provision.

**H. Estimated Time of Trial**

The Commerce Parties estimate that it will take one (1) or two (2) days for the Commerce Parties to present their evidence, and two (2) or three (3) days to litigate all the issues involved in the trial.

Respectfully submitted,
Defendants,
Commerce Park Realty, LLC and
Commerce Park Associates 9, LLC,
By their Attorneys,

/s/ Brian LaPlante
Brian LaPlante, Esq./#5861
Nicole M. Labonte, Esq./#7255
LaPlante Sowa Goldman
67 Cedar Street
Providence, RI 02903
TEL: (401) 273-0200
FAX: (401) 273-0250

**CERTIFICATION**

Gregory L. Benik, Esquire
Nixon Peabody, LLP
One Citizens Plaza
Providence, RI 02903

David B. Graham, Esquire
Kaufman & Canoles, P.C.
4801 Courthouse Street, Suite 300
Post Office Box 6000
Williamsburg, Virginia 23188

Scott L. Hammer, Esquire
Hodosh Lyon & Hammer, Ltd.
1023 Post Road
Warwick, RI 02888

Mark O. Denehy, Esquire
Geoffrey W. Millsom, Esquire
Elizabeth McDonough Noonan, Esquire
Adler Pollock & Sheehan
One Citizens Plaza, 8th Floor
Providence, RI 02903

Anthony F. Muri, Esquire
Goldenberg & Muri LLP
10 Weybosset Street
Providence, RI 02903

Brian A. Wagner, Esquire
RI DEM
Office of Legal Services
235 Promenade Street
Providence, RI 02908

Patrick J. Sullivan, Esquire
Law Offices of Patrick J. Sullivan, Esquire
505 Tiogue Avenue, Suite B
Coventry, RI 02816

Michael A. DeSisto, Esquire
DeSisto Law
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563

I hereby certify that on this 5th day of October 2007, I caused a true and accurate copy of the within document to be sent via electronic means through the CM/EFC system of the United States District Court to the above-listed attorneys.

/s/ Brian LaPlante